**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
BRETT M. MIDDLETON (Bar No. 199427)
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Tel:    (858) 793-0070
Fax:    (858) 293-0323
brettm@blbglaw.com
          -and-
MARK LEBOVITCH
DAVID L. WALES
ADAM D. HOLLANDER
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
markl@blbglaw.com
davidw@blbglaw.com
adam.hollander@blbglaw.com

*Attorneys for Plaintiff International Union
of Operating Engineers Local 478*

*[Additional Counsel on Signature Page]*


## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE IMPAX LABORATORIES, INC. SHAREHOLDER DERIVATIVE LITIGATION | Case No. 14-cv-04266-HSG<br><br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................iii-v

I.  STATEMENT OF THE ISSUES TO BE DECIDED........................................ 1

II.  PRELIMINARY STATEMENT ....................................................................... 1

III.  STATEMENT OF FACTS ................................................................................. 3

    A.  Impax's Business Is Highly Regulated ................................................ 3

    B.  Impax Received A Warning Letter And Multiple Form 483s For Repeat FDA Violations ...................................................................... 4

    C.  The FDA Withheld Approval Of Rytary And GSK Terminated A Key Agreement With Impax ................................................................ 6

    D.  The cGMP Violations Continued In 2014 .......................................... 6

    E.  Defendants Willfully Ignored Regulatory Failures.............................. 7

    F.  Defendants Made False And Misleading Statements Concerning The Violations ................................................................................... 8

IV.  DEMAND IS EXCUSED .................................................................................. 9

    A.  Legal Standard For Demand Futility ................................................... 9

    B.  A Majority Of The Board Knew Of Regulatory Violations, But Failed To Ensure Compliance .......................................................... 11

        1.  Annual Reports Describe The Violations And Were Signed By A Majority Of The Board.................................................... 11

        2.  The Audit And Compliance Committees Had Heightened Awareness Of The Violations ............................................... 14

    C.  Conscious Failure To Remedy Known FDA Violations By A Majority Of The Board Excuses Pre-Suit Demand............................. 16

        1.  Demand Is Excused Based On The Defendants' Deliberate And Sustained Inaction Over A Five Year Period.................... 17

V.  THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY ................................................................................... 22

    A.  Legal Standards For Breach Of Fiduciary Duty Claim ...................... 22

    B.  The Complaint States A Breach Of Fiduciary Duty Claim ................ 22

    C.  The Complaint States A Claim For False Statements.......................... 23

    D.  Impax's Exculpatory Provision Does Not Protect Defendants............ 25

1

VI.      CONCLUSION .......................................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

CASES

*In re Abbott Lab Derivative S'holder Litig.*,
   325 F.3d 795 (7th Cir. 2003) ........................................................................ passim

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
   554 F. Supp. 2d 538 (D. Del. 2008)...........................................................25

*In re American Apparel, Inc. Derivative Litig.*,
   2012 WL 9506072 (N.D. Cal. July 31, 2012)..........................................23

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) .........................................................................10

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).............................................................................22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................22

*Beneville v. York*,
   769 A.2d 80 (Del. Ch. 2000)....................................................................11

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ...................................................................10, 11

*Burnette v. Carothers*,
   192 F.3d 52 (2d Cir. 1999).......................................................................22

*In re Caremark Int'l, Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)..................................................................23

*In re Cendant Corp. Derivative Action Litig.*,
   189 F.R.D. 117 (D.N.J. 1999)............................................................10, 25

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1156 (Del. 1995) ......................................................................22

*In re Connectics Corp. Secs. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) .....................................................24

*In re Extreme Networks, Inc. Derivative Litig.*,
   573 F.Supp.2d 1228 (N.D. Cal. 2008) ................................................13, 15

*In re Galena Biopharma, Inc. Derivative Litig.*,
   2015 WL 455385 (D. Or. Feb. 4, 2015).....................................................25

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Gomez v. Toledo,*
    446 U.S. 635 (1980)................................................................................................9

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) ................................................................................10

*Grobow v. Perot,*
    539 A.2d 180 (Del. 1988) ..................................................................................10

*Halebian v. Berv,*
    590 F.3d 195 (2d Cir. 2009).............................................................................22

*Heller v. Kiernan,*
    2002 WL 385545 (Del. Ch. Feb. 27, 2002), aff'd, 806 A.2d 164 (Del. 2002) ....................22

*In re infoUSA, Inc. S'holders Litig.,*
    953 A.2d 963 (Del. Ch. 2007)....................................................................23, 24

*Int'l Equity Capital Growth Fund, L.P. v. Clegg,*
    1997 WL 208955 (Del. Ch. Apr. 22, 1997) ....................................................11

*In re Intel Corp. Derivative Litig.,*
    621 F.Supp.2d 165 (D. Del. 2009) ...................................................................13

*In re Johnson & Johnson Derivative Litig.,*
    865 F.Supp.2d 545 (D.N.J. 2011) ..............................................................13, 15

*Kamen v. Kemper Fin. Servs.,*
    500 U.S. 90 (1991)..............................................................................................9

*Levine v. Smith,*
    591 A.2d 194 (Del. 1991) ..................................................................................11

*Malone v. Brincat,*
    722 A.2d 5 (Del. 1998) ................................................................................22, 24

*McCall v. Scott,*
    239 F.3d 808 (6th Cir. 2001) ............................................................................21

*Metro Commc'n. Corp. BVI v. Advanced MobileComm Techs. Inc.,*
    854 A.2d 121 (Del. Ch. 2004)..........................................................................24

*Mulligan v. Impax Labs, Inc., et al.,*
    No. 13-cv-01037-EMC (N.D. Cal.) ...................................................................9

*In re Oxford Health Plans, Inc.,*
    192 F.R.D. 111 (S.D.N.Y.2000) ......................................................................21

*In re Pfizer Inc. S'holder Derivative Litig.,*
    722 F. Supp. 2d 453 (S.D.N.Y. 2010).................................................16, 20, 21

*In re Polycom, Inc.*
  2015 WL 164198 (N.D. Cal. Jan. 13, 2015) ..........................................................................15

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ...................................................................................................10

*Rosenbloom v. Pyott*,
  765 F.3d 1137 (9th Cir. 2014) ...................................................................................... passim

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007)..............................................................................................10

*Ryan v. Lyondell Chem. Co.*,
  2008 WL 4174038 (Del. Ch. Aug. 29, 2008) ...............................................................16, 25

*In re SAIC Inc. Derivative Litig.*,
  948 F. Supp. 2d at 387 .........................................................................................................21

*Sanders v. Wang*,
  1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ........................................................................25

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) .....................................................................................21

*Silverberg v. Gold*,
  2013 WL 6859282 (Del. Ch. Sept. 31, 2013) ......................................................................11

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del. 2006) ....................................................................................................23

*In re Tower Air, Inc.*,
  416 F.3d 229, 242 (3rd Cir.) ...............................................................................................25

*In re Veeco Instr., Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006)....................................................................13, 16, 21

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P. 23.1 ...................................................................................................................9

Section 102(b)(7) of the Delaware General Corporation Law.....................................................25

I.     **STATEMENT OF THE ISSUES TO BE DECIDED**

Whether Co-Lead Plaintiffs Randall K. Wickey and the International Union of Operating Engineers Local 478 (collectively the "Plaintiffs") adequately pled in its Verified Consolidated Shareholder Derivative Complaint For Breach Of Fiduciary Duty (the "Complaint") that: (a) demand on the board of directors (the "Board") of nominal defendant, Impax Laboratories, Inc. ("Impax" or the "Company") would have been futile and, therefore, was excused; and (b) defendants Leslie Z. Benet ("Benet"), Robert L. Burr ("Burr"), Allen Chao ("Chao"), Nigel T. Fleming ("Fleming"), Larry Hsu ("Hsu"), Arthur A. Koch ("Koch"), Michael Markbreiter ("Markbreiter"), Michael J. Nestor ("Nestor"), Mary K. Pendergast ("Pendergast"), Bryan M. Reasons ("Reasons"), Peter R. Terreri ("Terreri") and G. Frederick Wilkinson ("Wilkinson"), (collectively the "Individual Defendants)[1] breached their fiduciary duties by: (i) knowingly or recklessly failing to comply with legal and regulatory obligations, including failing to take adequate, necessary corrective action in response to the United States Food and Drug Administration ("FDA") warnings; and (ii) knowingly or recklessly disseminating to the public materially false and misleading statements concerning the FDA regulatory issues at the Company.

II.    **PRELIMINARY STATEMENT**

Plaintiffs in the above captioned shareholder derivative action (the "Action") properly allege in the Complaint that: (i) pre-suit demand on the Impax Board would have been futile, and therefore was excused, and (ii) the members of the Board and certain senior officers of the Company breached their fiduciary duties.   Accordingly, Plaintiffs respectfully submit this memorandum of law in opposition to the Defendants' Motion to Dismiss.[2]

As a pharmaceutical company, Impax is heavily regulated by the FDA.  This regulatory oversight is designed to protect public health, including by insuring that the pharmaceutical drugs companies make and distribute are manufactured to high standards of quality and are of consistent potency.    As part of the FDA regulatory oversight, the FDA conducts inspections of

---

[1] "Defendants" refers to Impax and the Individual Defendants.  "Director Defendants" refers to Hsu, Wilkinson, Benet, Burr, Chao, Fleming, Markbreiter, Pendergast and Terreri.  The "Officer Defendants" refers to Hsu, Wilkinson, Koch, Nestor, and Reasons.

[2] References to Defendants' Motion to Dismiss shall appear as "Defs.' Brf. at __."

pharmaceutical companies' facilities and issues inspection reports, known as Form 483s and Warning Letters for violations of the FDA's Good Manufacturing Practice ("cGMP") regulations or other violations of federal law.

The Complaint sets out in detail that: (i) the Company was subject to and received Form 483s for cGMP violations each year between 2009 and 2014; (ii) the seven separate Form 483s listed numerous repeat violations that were not corrected over a five-year period; (iii) the FDA issued a Warning Letter in May of 2011 because the ongoing violations were so serious and were not being corrected; (iv) four of the Form 483s were issued for violations occurring after the Warning Letter was issued; (v) in 2013, the FDA rejected the approval application for the Company's key drug, RYTARY[TM] ("Rytary"), because of the Company's failure to address the violations detailed in the Warning Letter; (vi) in 2013, GlaxoSmithKline ("GSK"), the Company's critical business partner for Rytary, ended an agreement that could have paid Impax $166 million to develop and commercialize Rytary due to the FDA's delay of its approval; (vii) Impax and certain officers and directors were twice sued for securities fraud for making false statements about regulatory compliance; and (viii) the defendants settled both lawsuits after the Court in the first securities fraud class action found that the complaint properly alleged a securities fraud.

The Complaint also details how the directors knew about these myriad problems, including: (i) from personally receiving certain of the FDA Form 483s and the Warning Letter; (ii) from signing public filings, including the annual reports that described the violations in the Form 483s and the Warning Letter; and (iii) being on committees that represented that they had specific responsibility for oversight of enterprise risk management (*i.e.,* the Audit Committee) or compliance with regulations (*i.e.,* the Compliance Committee). Moreover, the violations go to the core of the business of a pharmaceutical company, and here the violations caused the Company to have delayed by years its critical new drug and lose its major business partner, with its potential for nine figure milestone payments.

Apparently recognizing that the Complaint's detailed allegations strongly support both a finding of demand futility and breach of fiduciary duty, Defendants simply ignore many, if not most, of the significant factual allegations in the Complaint. For example, Defendants' motion

fails to address the following:

1. In 2013 the FDA rejected the application for Rytary due to the continuing cGMP violations at Impax and the failure to correct them over a period of years;

2. GSK ended its agreement to develop and market Rytary due to the delays in obtaining FDA approval as a result of the continuing FDA problems, with the loss of milestone payments to Impax of up to $166 million;

3. That while the rampant violations of FDA regulations continued for five straight years, the Defendants' motion fails to holistically address the scope of the violations alleged;

4. The Defendants had actual knowledge of the violations, yet allowed them to continue for at least five years; and

5. The Board members had specific duties and responsibilities as set forth in the proxy statements and the audit and compliance committee charters, yet utterly failed to act, allowing the violations to continue for at least five years, causing substantial harm to the Company.

As set forth in more detail below, based on the actual allegations and applying the correct pleading standards, the Complaint more than adequately pleads both demand futility and breaches of duty. As such, Defendants' motion should be denied in its entirety.

## III.   STATEMENT OF FACTS

### A.   Impax's Business Is Highly Regulated

Impax is a pharmaceutical development and manufacturing company incorporated in Delaware. ¶¶6, 18.[3] Impax has two reportable segments: (i) the Global Pharmaceuticals Division, which develops, manufacturers, and sells generic pharmaceuticals; and (ii) the Impax Pharmaceuticals Division, which develops proprietary brand pharmaceuticals that address central nervous system disorders. ¶34. Impax operates two manufacturing facilities, one in Hayward, California (the "Hayward Facility") and the second in Taiwan, Republic of China (the "Taiwan Facility"). Presently, Impax has one internally developed and recently approved branded pharmaceutical drug, Rytary, designed to treat Parkinson's disease. ¶¶6, 36.

The FDA regularly inspects the manufacturing facilities of companies such as Impax to determine compliance with the agency's current cGMP regulations. ¶¶3, 38. The cGMP regulations constitute *minimum* requirements that a pharmaceutical manufacturer *must* meet to

---

[3] References herein to the Complaint appear in the following format: "¶ or ¶¶__."

assure that products are of high quality and do not pose undue risk to consumers. *Id*.  If FDA inspectors observe cGMP violations, the FDA will issue a Form 483 "Notice of Observations" to the senior management of the company, detailing observed violations. ¶¶3, 40-41.  Failure to fully comply subjects the company to more serious regulatory action, including an FDA Warning Letter, the rejection of drug applications, or other significant consequences. ¶¶4, 41-42.  FDA Warning Letters are rare and notify the company of violations that are of such "regulatory significance" that they can lead to FDA enforcement actions. *Id*, ¶44.

**B.**   **Impax Received A Warning Letter And Multiple Form 483s For Repeat FDA Violations**

Between 2009 and 2014, Impax received a Warning Letter and seven Form 483s for repeat FDA violations.  Following an inspection at the Hayward Facility, on August 7, 2009, the FDA issued Impax a Form 483 (the "2009 Form 483"), which identified four violations related to Impax's manufacturing processes (¶46a), record keeping (¶46b), stability testing (¶46c), and quality standards (¶46d).

The next year, despite the serious failures identified in the 2009 Form 483, the FDA issued Impax yet another Form 483 (the "2010 Form 483"), that identified repeat failures in need of corrective action. *Id*.  The FDA observed, among other things, that there were no established procedures to prevent drug contamination or for the cleaning and maintenance of certain equipment (¶47a, c), the written procedures established for cleaning of certain equipment were deficient (¶47b, d), certain test methods were not established (¶47e), there was a failure to investigate metal contamination (¶47f) and control records were deficient (¶47g).

On January 21, 2011, the FDA issued a third Form 483 to Impax (the "2011 Form 483") for violations at the Hayward Facility. ¶49.  The FDA observed that control procedures were not established (¶49b), equipment was not maintained at appropriate intervals to prevent malfunctions (¶49c), written procedures were not followed (¶49d,e) and there was a repeated failure to take corrective action to mitigate the root cause of metal contamination (¶49a).  During the inspection, an FDA investigator issued Impax management a "verbal warning" for misleading the inspection team by falsely referring to contamination of certain drugs as merely "grey particles." ¶50.

In May of 2011, the persistent and recurring problems identified at Impax came to a head when the FDA issued the Company an official warning letter (the "Warning Letter") addressed to the Company's Chief Executive Officer ("CEO") and Board member, Defendant Hsu. ¶51. The Warning Letter noted that cGMP violations "cause[d] [Impax's] drug product(s) to be adulterated within the meaning of . . . the Federal Food, Drug, and Cosmetic Act . . . in that the methods used in, or the facilities or controls used for, their manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, cGMP." *Id*. Moreover, the Warning Letter stated that the Company's response to the 2011 Form 483 "lack[ed] sufficient corrective actions" and went on to detail specific repeat violations that the Company failed to remedy, including, among other things, failures to establish certain written procedures, validate distributed drugs, provide data to support the temperature range used during drug production and investigate metal contamination. ¶52. And, the Warning Letter instructed the Company to "take prompt action to correct the violations cited," including "investigating and determining the causes of the violations" identified therein and "preventing their recurrence and the occurrence of other violations." ¶53. Finally, the FDA warned that failure to promptly correct the cited violations could result in the FDA's withholding approval of pending drug applications. ¶54.

On March 28, 2012, the FDA issued Impax its fourth Form 483 following an inspection, (¶65), which set forth repeat cGMP violations (the "2012 Form 483") concerning stability testing (¶66c), record keeping (¶66a, d, e), manufacturing processes (¶66b, e), and quality standards (¶66a). Thus, more than three years after receiving the 2009 Form 483, the recurring violations at Impax's Hayward Facility continued unabated and the issues identified in the Warning Letter remained unresolved. ¶¶55-64.

Rather than addressing the cGMP violations noted in the 2012 Form 483, the Individual Defendants sat dormant and took no corrective action. ¶69. As a result of their inaction, the FDA issued yet another Form 483 (the "2013 Form 483") which detailed at length cGMP violations at the Hayward Facility after an inspection from January 8 to February 28, 2013. *Id*. Significantly, the repeat violations included the failure to establish the accuracy, sensitivity, specificity and reproductivity of test methods (¶70a, b, g, l), the failure to establish control procedures which

validate the performance of manufacturing processes (¶70c, k) and the failure to follow procedures describing the warehousing of drug products (¶70d, e, f, j).

The members of the Board were well-aware of these serious cGMP violations, yet they inexplicably took no corrective action. ¶¶71-74. And, the market understood that the recurring cGMP violations were materially harmful to Impax. ¶76. Following the Company's announcement of the 2013 Form 483 after the close of trading on March 4, 2013, Impax's stock fell 26% to close at $14.80 on March 5, 2013, on trading volume of 11.7 million shares – more than sixteen times higher than the average daily trading volume for Impax stock. *Id.*

### C.     The FDA Withheld Approval Of Rytary And GSK Terminated A Key Agreement With Impax

In January of 2013, the FDA refused to approve Rytary. This decision was in direct response to the Individual Defendants' failure to address the persistent problems identified in the Forms 483s and the Warning Letter. *See* ¶¶6, 77, 78 ("the FDA requires a satisfactory re-inspection of the company's Hayward facility as a result of the warning letter issued in May 2011 before the company's NDA may be approved."). GSK then terminated a December 2010 agreement with Impax to commercialize Rytary outside of the United States and Taiwan due to "delays in the anticipated regulatory approval and launch dates." ¶¶7, 79. As a result, Impax suffered harm both from the loss of sales due to the delay in receiving FDA approval of the Rytary new drug application ("NDA") and from the loss of payments from GSK as a result of the termination of the agreement, which are in excess of $100 million. ¶80.

### D.     The cGMP Violations Continued In 2014

In July 2014, the FDA issued Impax another Form 483, this time concerning serious cGMP violations at the Taiwan Facility (the "2014 Taiwan Form 483"). ¶¶9, 85. According to the Company, the FDA inspected the Taiwan Facility in part as a "Pre-Approval Inspection" for Rytary. ¶85. The 2014 Taiwan Form 483 identified violations that were substantially similar to the reoccurring problems at the Hayward Facility and included the same FDA regulated categories: (i) "Stability Testing" (¶86b – "Examination and testing of samples is not done to assure that in-process materials conform to specifications"); (ii) "Record Keeping" (¶86i – failure to generate

annual "report of complaints, recalls, returned drug product, investigations, and process controls");
(iii) "Manufacturing Processes" (¶86f – "failure to conduct a thorough review of the failure of a
batch or any of its components to meet any of its specifications"); and (iv) "Quality Standards"
(¶86d – "ha[s] not established an acceptable range of process parameters for… quality attributes").

Just days after the 2014 Taiwan Form 483 was issued, on July 31, 2014, the FDA sent
Impax a Form 483 following its July 2014 inspection of the Hayward Facility (the "2014 Hayward
Form 483").  ¶90.  Included in this Form 483 were repeat violations concerning the failure to
establish the accuracy, sensitivity, specificity and reproductivity of test methods and the failure to
exercise appropriate controls over computer or related records systems.  *Id.*

Defendants acknowledged that the violations detailed in the 2014 Taiwan and Hayward
Forms 483 may result in significant, negative consequences to the Company. ¶91.  In September
2014, the Company announced that its continuing failure to comply with cGMP regulations was
further delaying the approval of Rytary.  ¶92.  The announcement of the cGMP violations at the
Taiwan Facility caused the Company's stock price to fall 15.2% on high trading volume. ¶88.

### E.     Defendants Willfully Ignored Regulatory Failures

The Individual Defendants were well-aware of the cGMP violations identified in the Forms
483 and the Warning Letter but failed to take any corrective action.  The Company disclosed the
Warning Letter in a Form 8-K which was signed by Defendant Koch and quoted Defendant Hsu
as stating "we intend to promptly respond to the FDA's letter, and have already begun to
implement changes and establish procedures that address the observations cited during the
inspection…"  ¶63.  On August 4, 2011, Impax filed with the U.S. Securities and Exchange
Commission ("SEC") its Quarterly Report on Form 10-Q, signed by Defendants Hsu and Koch,
that discussed the Warning Letter and the potential impact the letter could have on the Company,
including "additional regulatory action by the FDA" and that "the FDA may withhold approval of
pending drug applications…"  ¶56.

The Company's Annual Reports filed on Form 10-K with the SEC ("Annual Report") for
the years 2011, 2012, and 2013 were signed by a majority of the Board and described the
Company's receipt of the Form 483s and Warning Letter.  ¶¶60, 71, 122-125.  Director Defendants

1    Benet, Burr, Chao, Fleming, Hus, Markbreiter, and Terreri each signed the 2011, 2012, and 2013

2    Annual Reports.  ¶¶61, 72, 98.

3           Thereafter, on August 6, 2014, the Company filed with the SEC its Quarterly Report on

4    Form 10-Q, signed by Defendants Reasons and Wilkinson, and a press release dated September

5    17, 2014, that discussed, among other things, the Company's receipt of the Warning Letter as well

6    as the harms and risks to the Company resulting from the FDA's scrutiny and actions, and the

7    Company's repeated regulatory violations.  ¶¶91, 92.

8           The Individual Defendants who were members of the Audit and Compliance Committees

9    had a heighted awareness of the cGMP violations because these two committees were charged

10   with oversight of the Company's enterprise risk and regularly received reports from management

11   concerning regulatory violations.  ¶¶58, 73, 75.  Specifically, the Company's 2012 Annual Proxy

12   stated that "the audit committee plays a key role in the oversight of our enterprise risk management

13   function" and the Chief Financial Officer ("CFO"), who is responsible for Impax's enterprise risk

14   management "reports…to the audit committee" and "meets with the audit committee at least four

15   times a year to discuss the risks facing [the] company…."  *Id.*

16          In May 2013, the Company created the Compliance Committee, who shared the

17   responsibility for oversight and enterprise risk with the Audit Committee and was directly

18   responsible for "oversight of FDA regulatory compliance" and "oversee[ing] the Company's

19   compliance policies and practices in areas of FDA regulatory compliance."  ¶¶93, 116.  Defendants

20   Benet, Chao, Pendergast and Terreri were members of the Compliance Committee during the

21   periods leading up to and following the 2014 Taiwan and Hayward Forms 483.  ¶¶93-94.

22          **F.      Defendants Made False And
                      <u>Misleading Statements Concerning The Violations</u>**

23

24          Notwithstanding the serious nature of the 2009 and 2010 Forms 483 and the potentially

25   catastrophic consequences to the Company if the necessary corrective actions were not taken,

26   Defendant Koch publicly downplayed their significance and falsely stated that Impax had been

27   able to "enjoy a very good FDA inspection record" and the issues contained in the Forms 483 had

28   been "addressed promptly."  ¶48.  Following receipt of the Warning Letter, Defendant Koch falsely

stated at a Health Care Conference that the Warning Letter would be closed out "before March 1, 2012" and during an earnings call on February 28, 2012, Defendant Hsu falsely stated "we have done everything we can…. [s]o we're pretty confident at this point we will be able to handle the FDA inspection smoothly."  ¶57.

Following the FDA's issuance of the 2012 Form 483, certain of the Individual Defendants went on the defensive, falsely claiming that the issues identified were "independent" from the May 2011 Warning Letter and that there were "no repeat observations."  ¶67.  Director Defendants Benet, Burr, Chao Fleming, Markbreiter and Terreri were responsible for disseminating numerous false and misleading statements between June 2011 and October 2012.  ¶97.  These Defendants knowingly caused and allowed the Company to repeatedly assure stockholders that the Company was adequately addressing and remedying the cGMP violations, which these Defendants knew were not true.  *Id.*  The Court in *Mulligan v. Impax Labs, Inc., et al.*, No. 13-cv-01037-EMC (N.D. Cal.) (the "Class Action") substantially denied the motion to dismiss and found the complaint alleged these statements to be false or misleading statements of material fact.  *Id.*

## IV.  **DEMAND IS EXCUSED**

### A.  **Legal Standard For Demand Futility**

A shareholder derivative action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers and directors.  *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991).  Pursuant to Fed. R. Civ. P. 23.1, a derivative plaintiff must allege either: (a) that he has made a pre-suit demand on the corporation's board of directors to take the requested action; or (b) the reasons for not making a demand.

In considering a Rule 23.1 motion to dismiss, a federal court must accept as true all allegations in the complaint, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff.  *See Gomez v. Toledo*, 446 U.S. 635, 636 n.3 (1980).  Because Impax is a Delaware corporation, Delaware law controls the instant demand futility analysis.  *See Kamen*, 500 U.S. at 108-09.

Under Delaware law, a plaintiff is excused from making a pre-suit demand if there is reason to doubt that: (i) a majority of a board's directors are independent or disinterested; or (ii) the

challenged acts are a valid exercise of business judgment.  *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  Where a complaint does not challenge a specific action or decision of the board, demand is excused where the complaint raises a ***reasonable doubt*** that a majority of the directors are disinterested or independent.  *See Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).

"Reasonable doubt," as applied by Delaware courts, means reason to doubt that a board is capable of making an independent or disinterested decision.  *Id.; see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988).  Thus, a plaintiff only need allege with particularity facts that would give a reasonable shareholder reason to doubt the directors' ability to consider a demand disinterestedly.  *Id*.  This is particularly appropriate in derivative suits, because plaintiffs typically have not had the benefit of discovery.  *See Rales*, 634 A.2d at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").  The reasonable doubt standard set forth in *Rales* "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).

A plaintiff may raise reasonable doubt regarding the disinterestedness of directors by demonstrating that they are subject to a "substantial likelihood of liability."  *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007); *see Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014) ("*Allergan*") (when directors face a "substantial likelihood" of personal liability, "their ability to consider a demand impartially is compromised under *Rales*, excusing demand.")  Such liability can be based upon a violation of the duty of loyalty.  *See Allergan*, 765 F.3d at 1150.  The duty of loyalty "is violated '[w]here directors ***fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities*** [and] failing to discharge [the non-exculpable fiduciary duty of loyalty] in good faith.'"  *Id*. at 1150 (emphasis added).

The Court should reject any argument to attack demand-futility allegations piecemeal, and instead must consider the allegations in the Complaint holistically.  *See Brehm v. Eisner*, 746 A.2d 244, 268 (Del. 2000); *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) (applying Delaware law) (court "must… examine the totality of the circumstances and

consider all of the relevant factors").  Even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of the plaintiff's allegations in combination may be sufficient to do so.  *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. Civ.A. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

Finally, a plaintiff need not plead evidence, a "smoking gun," or a confession.  *See Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991), overruled in part on other grounds by *Brehm*, 746 A.2d 244; *see also Silverberg v. Gold*, C.A. No. 7646-VCP, 2013 WL 6859282, at *10, 13 (Del. Ch. Sept. 31, 2013) (under Rule 23.1, "the pleader is not required to plead evidence"; even where no single fact alleged supported the reasonable inference of directors' knowledge of material information, "when the Complaint and the relevant facts apparent from documents integral to it are considered in the aggregate, they do support such a reasonable inference.").

### B.    A Majority Of The Board Knew Of <u>Regulatory Violations, But Failed To Ensure Compliance</u>

When this Action was first initiated, the Board consisted of nine directors:  Defendants Burr, Benet, Chao, Fleming, Hsu, Markbreiter, Pendergast, Terreri, and Wilkinson. ¶121.  Therefore, to adequately plead demand futility, Plaintiffs need only raise a reason to doubt the disinterestedness or independence of five directors.  *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000).  While the Complaint alleges demand futility for all nine directors, focusing on five directors – Defendants Burr, Chao, Hsu, Markbreiter, and Terreri – establishes demand was excused.  These five defendants were fully informed of the repeat FDA violations, as evidenced by their approval and execution of the relevant annual reports and role as Audit Committee members, Compliance Committee members, and/or CEO.   Accordingly, each of these five directors faces a substantial likelihood of liability – and thus were not disinterested at the time this action was first commenced – for their conscious decisions not to properly address the reoccurring FDA violations at Impax between 2009 and 2014.

### 1.    Annual Reports Describe The Violations <u>And Were Signed By A Majority Of The Board</u>

The Complaint sets forth specific facts showing that a majority of the Board signed the

Company's relevant Annual Reports, which described in detail the cGMP violations and Warning Letter.  ¶122.  For example, the Company's Annual Report for 2011 filed on Form 10-K with the SEC on February 28, 2012 (the "2011 Annual Report") states:

> In June 2011, we received a warning letter from the U.S. Food and Drug Administration (FDA) related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011.  In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards. In summary, the FDA observations related ***to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.*** The FDA observations do not place restrictions on our ability to manufacture and ship our products.

Significantly, the 2011 Annual Report was signed by Director Defendants Burr, Chao, Hsu, Markbreiter, and Terreri (as well as Defendants Benet and Fleming) ¶98.  The 2011 Annual Report went on to admit that the Company "may be subject to additional regulatory action by the FDA as a result of the current or future FDA observations" and that sanctions could include "total or partial suspension of production and/or distribution, and suspension or withdrawal of regulatory approvals" and that as a result, Impax's "business, consolidated results of operations and consolidated financial condition could be materially adversely affected."  Hence, no later than February 28, 2012, Director Defendants Benet, Burr, Chao, Fleming, Hsu, Markbreiter, and Terreri necessarily had actual knowledge of the May 2011 Warning Letter and the reasons for it.

On February 26, 2013, Impax filed with the SEC its Annual Report on Form 10-K for the period ending December 31, 2012 (the "2012 Annual Report") and once again disclosed the May 2011 Warning Letter ¶60.  The 2012 Annual Report was also signed by Director Defendants Burr, Chao, Hsu, Markbreiter, and Terreri (as well as Defendants Benet and Fleming) (¶61) and disclosed that in the Warning Letter, the FDA "cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards."  ¶60.  The FDA's observations were summarized as follows:  sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications."  *Id*.  Finally, the 2012 Annual Report repeated the potential

consequences previously disclosed in the 2011 Annual Report, including withholding approval of

pending drug applications:

> [I]n January 2013, the FDA issued a Complete Response Letter regarding our NDA for our late stage branded pharmaceutical product candidate, RYTARY™, which we are developing internally, for the symptomatic treatment of Parkinson's disease. In the Complete Response Letter, the FDA indicated that it required a satisfactory re-inspection of our Hayward manufacturing facility ***as a result of the warning letter issued to us in May 2011 before the NDA may be approved by the FDA*** due to the facility's involvement in the development of RYTARY™ and supportive manufacturing and distribution activities.

¶60 (emphasis added).

On February 25, 2014, Impax filed with the SEC its Annual Report on Form 10-K for the

period ending December 31, 2013 (the "2013 Annual Report") which was again signed by Director

Defendants Burr, Chao, Hsu, Markbreiter, and Terreri, (as well as Director Defendants Benet,

Fleming, and Pendergast).  ¶72.  The 2013 Annual Report once again disclosed receipt of the May

2011 Warning Letter, as well as the Form 483 observations from the FDA, and warned that failure

to "promptly correct the issues raised" could "materially and adversely" affect Impax's "business,

results of operations and financial condition."  ¶71.  The 2013 Annual Report also disclosed that

the cGMP violations found by the FDA related to "sampling and testing of in-process materials

and drug products, production record review, and our process for investigating the failure of certain

manufacturing batches (or portions of batches) to meet specifications."  *Id*.  Finally, the 2013

Annual Report repeated again that the FDA "required a satisfactory inspection of our Hayward

manufacturing facility as a result of the warning letter issued to us in May 2011 before the NDA

may be approved by the FDA due to the facility's involvement in the development of RYTARY™

and supportive manufacturing and distribution activities."  *Id*.[4]

---

[4] Citing (at pages 14-15 of the Defs.' Brf.) *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165 (D. Del. 2009), *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545 (D.N.J. 2011), *In re Extreme Networks, Inc. Derivative Litig.*, 573 F. Supp. 2d 1228, (N.D. Cal. 2008) and other cases, Defendants argue that signing of public documents is insufficient by themselves to infer knowledge of illegality or likelihood of liability.  In actuality, the cases stand for the common sense proposition that directors' knowledge based on the public filings would depend on what was disclosed in the filing.  *See, Johnson & Johnson*, 865 F. Supp. 2d at 566, "the 10-K's statement is distinguishable from those cases that infer Board knowledge from a 10-K that explicitly acknowledges corporate misconduct.  *See, e.g.*, *In re Veeco Instr., Inc. Sec. Litig.*, 434 F. Supp. 2d

Accordingly, because a majority of the Board (*e.g.,* Director Defendants Burr, Chao, Hsu, Markbreiter, and Terreri) signed the Company's 2011, 2012, and 2013 Annual Reports, a majority of the Board was fully aware of the May 2011 Warning Letter, 483 cGMP violations, and related consequences to the Company as early as February 28, 2012, and likely much earlier. ¶¶122-125.

### 2. The Audit And Compliance Committees Had Heightened Awareness Of The Violations

The Complaint shows how, due to their roles on the Audit Committee (Defendants Chao, Terreri, Burr, and Markbreiter) and Compliance Committee (Defendants Chao and Terreri), these directors had *even more knowledge* concerning the cGMP violations detailed on the Form 483s and the Warning Letter. ¶¶21-27, 58, 59, 73, 74, 93, 94, 107, 116, 131-133.

Significantly, the Defendants on the Audit Committee, as well as the Board as a whole, had oversight responsibility for Impax's enterprise risk. ¶¶58, 73, 74, and 93. Impax's Proxy Statement for 2012 states that the Audit Committee "plays a key role in the oversight of our enterprise risk management function" on behalf of the Board. ¶58. Defendant Koch, as CFO, is "directly responsible for our enterprise risk management function" and he reports both to the Audit Committee and the CEO, Defendant Hsu, who was also a director. ¶58. Defendant Koch worked closely with not only members of senior management, but with the Audit Committee, which he met with at least four times each year to "discuss the risks facing" Impax and "highlighting any new risks that may have arisen since the committee last met." *Id*. And, the Audit Committee reported to the Board "on a regular basis to apprise them of their discussions with Mr. Koch regarding our enterprise risk management efforts." *Id*. Finally, Defendant Koch reported directly to the board "on at least an annual basis to apprise it directly of our enterprise risk." *Id.*

Moreover, according to the detailed allegations in the Complaint, any deviations from the Company's Ethics Code were routinely reported to the Company's Audit Committee. ¶115. Significantly, this Ethics Code states that wherever the Company does business, Impax is "required

---

267, 277 (S.D.N.Y. 2006) (relying on 10-K statement indicating that "a deficiency existed in internal control over financial reporting," yet the Board took no action for more than one year following this admission.)."

1   to comply with all applicable laws, rules, and regulations." ¶114. Moreover, the Company's

2   Ethics Code states that each Individual Defendant "is personally responsible for making sure that

3   our business decisions and actions comply at all times with the rules and regulations of federal,

4   state and local governments and other appropriate private and public regulatory agencies, and this

5   Code. . . . In addition, each of us has a duty to report behavior on the part of others that appears to

6   violate this Code or any other compliance policy or procedure of the Company." ¶113.

7        Finally, the Complaint also sets forth facts showing how the Compliance Committee,

8   including Defendants Chao and Terreri, also had oversight responsibility concerning compliance

9   with the FDA's regulations and reported to the Board (¶116), but failed to intervene and implement

10   adequate corrective measures. ¶¶93, 94, 107, 131-133, and 138.

11        Defendants claim that Plaintiffs asks this Court to find that demand is excused with respect

12   to Defendants Burr, Chao, Markbreiter, and Terreri simply by virtue of their membership on the

13   Audit Committee and/or Compliance Committee, Defs.' Brf. at 13-14, but this is not what the

14   Complaint alleges. *First*, for the reasons discussed above, all nine Director Defendants were

15   repeatedly informed of the cGMP violations and FDA scrutiny. *Second*, the Audit Committee and

16   Compliance Committee met regularly while the regulatory violations were ongoing. *Third*, the

17   detailed description of the Audit Committee's and Compliance Committee's responsibilities found

18   in the Complaint strongly suggests that Defendants Burr, Chao, Markbreiter, and Terreri would

19   have received *even more information* regarding the regulatory issues than the full Board, belying

20   any argument that they were ignorant of rampant FDA violations.[5] ¶¶58, 73, 93, 94, 107, 115, 116,

21   131-133, and 138.

22

23

24

25

---

26   [5] For these reasons, Defendants' reliance on *In re Polycom, Inc.* No. 13-CV-03880 SC, 2015 WL
164198, at *9 (N.D. Cal. Jan. 13, 2015), *Extreme Networks,* 573 F. Supp. 2d at 1239 and *Johnson*

27   *& Johnson*, 865 F. Supp. 2d at 565 is inapposite because Plaintiffs do not rely on mere membership
to impute knowledge but rather describe in detail the members' duties and obligations with respect

28   to risk and compliance, how often they met with management and the full Board, and their
reporting functions.

### C. Conscious Failure To Remedy Known FDA Violations By A Majority Of The Board Excuses Pre-Suit Demand

The Board's approach with respect to the Warning Letter and Form 483s constituted an "'intentional dereliction of duty'" and "'conscious disregard for one's responsibilities,'" each of which is 'properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.'" *See e.g.*, *Ryan v. Lyondell Chem. Co.*, No. 3176-VCN, 2008 WL 4174038 at *3 (Del. Ch. Aug. 29, 2008); *see Allergan*, 765 F.3d at 1151 ("If a majority of the Board had actual or constructive knowledge of violations of the law at Allergan involving off-label promotions of Botox and did nothing, it violated its duty of loyalty and faces a substantial likelihood of liability"); *see Veeco*, 434 F. Supp. 2d at 277.

The Ninth Circuit's decision in *Allergan* is on-point.  There, the plaintiffs alleged that the directors knew of or condoned illegal off-label marketing and branding of one of the company's primary products, Botox, in direct violation of federal marketing rules and regulations, stripping the board of business judgment rule protection. *See Allergan,* 765 F.3d at 1141-1142.  As in this action, the *Allergan* plaintiffs argued that the board knew or should have known of the problems about Botox through, *inter alia*, "letters from the FDA concerning Botox." *Id*. at 1146. Considering these allegations, the Ninth Circuit held that the Allergan board was aware of and/or consciously disregarded regulatory and legal problems with Botox and thus was not entitled to the protections of the business judgment rule. *Id*. at 1159.

The Southern District of New York's decision in *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010) is similarly instructive.  The *Pfizer* plaintiffs argued that it was reasonable to infer that directors were aware of continuing illicit activities and chose to disregard them because of repeated red flags, including various FDA violation notices and warning letters. *Pfizer*, 722 F. Supp. 2d at 460.  The Hon. Jed S. Rakoff agreed, and reasonably inferred at the pleading stage that Pfizer's board "at a minimum, knew of a high probability that Pfizer was continuing to purposely promote off-label marketing and deliberately decided to let it continue by blinding themselves to that knowledge." *Id*.

Finally, in the Seventh Circuit's seminal *Abbott Labs* decision, the plaintiffs alleged that

directors ignored "red flags" raised by the FDA's Forms 483 and Warning Letters about violations of healthcare regulations and took no action to remedy those problems or exercise reasonable oversight. *See In re Abbott Lab Derivative S'holder Litig.*, 325 F.3d 795 at 802-03 (7th Cir. 2003). The Seventh Circuit held that it was reasonable to infer that "the directors knew of the violations of law" and "took no steps in an effort to prevent or remedy the situation" and that failure to take any action established "a lack of good faith." *Id.* at 809.

As explained further below, Plaintiffs allege with particularity that despite knowledge of serious regulatory violations, the Director Defendants permitted the violations to recur, causing harm to the Company. ¶¶34-44, 77-82, 103-108. Accordingly, demand is excused.

### 1. Demand Is Excused Based On The Defendants' Deliberate And Sustained Inaction Over A Five Year Period

Plaintiffs set forth specific facts in the Complaint showing that from August 2009 through July 2014 – a span of five consecutive years – Impax's management received a total of seven Form 483 "Notice of Observations" and one Warning Letter detailing significant cGMP violations at the Company. ¶¶46, 47, 49-54, 65, 66, 69, 70, 84-86, 89, 90. Following a facility inspection by FDA investigators, each "Form 483 Observation" represents an instance where a drug has been "adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health." ¶40. Moreover, a "Warning Letter" is defined as "a correspondence that notifies regulated industry about violations that FDA has documented during its inspections or investigations." ¶ 43.

In its Quarterly Report filed on Form 10-Q on August 4, 2011, Impax disclosed receipt of the May 2011 Warning Letter and noted that the "FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing *manufacturing processes, stability testing, record keeping and quality standards*." ¶56 (emphasis added). As demonstrated by the table below, Impax had repeat violations in each of these four categories throughout the entire five-year period at issue:

| Form 483 Date | Stability Testing | Record Keeping | Manufacturing Processes | Quality Standards |
|---|---|---|---|---|
| August 2009 | ¶46c | ¶46b | ¶46a | ¶46a, b, d |
| April 2010 | ¶47e | ¶47b, d, g | ¶47f | ¶47a, c |
| January 2011 | ¶49e | ¶49d | ¶49a, b | ¶49a, b, c |
| March 2012 | ¶66c | ¶66a, d, e | ¶66b, e | ¶66a |
| February 2013 | ¶70a, b, g, 1 | ¶70d, e, f, j | ¶70c, k | ¶70h, j, k, 1 |
| July 2014 (Taiwan) | ¶86b, h | ¶86g, i | ¶86f | ¶86a, c, d, g, j |
| July 2014 (Hayward) | ¶90b | ¶90c, d, g | ¶90a | ¶90c, f |

Indeed, Impax summarized the specific cGMP violations noted in the May 2011 Warning Letter as covering the following three specific areas: (1) "**sampling and testing of in-process materials and drug products**"; (2) "**production record review**"; and (3) "**our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.**"  ¶56 (emphasis added).  The FDA's Observations demonstrate that these three types of violations were ongoing throughout the five-year period at Impax, and the Director Defendants never took action to correct the violations.  ¶¶46, 47, 49, 66, 70, 86, and 90.

For example, beginning in 2009, the FDA observed deficiencies in Impax's "sampling and testing of in-process materials and drug products," and continued to observe the same or similar deficiencies year after year.  *See*  ¶46c (2009 observation of "deficient" retesting that "lack[ed] documentation in the raw data notebook" that retesting was actually performed on samples that had previously failed); ¶47e (2010 observation that "[t]he sensitivity and specificity of test methods have not been established"); ¶49e (2011 observation that the Company did not employ "a suitable statistical tool to provide a representative sample for drug product evaluation"); ¶66c (2012 observation that "[w]ritten procedures for sampling and testing plans are not followed for each drug product"); ¶70a (2013 observation that "'[t]he accuracy, sensitivity, specificity, and reproducibility of test methods have not been established.'"  And "'[n]on-suitable test methods are used to release finished drug products,'" as "'[d]uring the establishment inspection, we reviewed test methods for eighteen (18) products and found that 100% of the reviewed methods were not

properly validated'"); ¶70g (2013 observation that the Company "d[id] not perform testing of raw materials for conformity with all written specifications," and instead "perform[ed] only limited testing" without "establish[ing] the reliability of the supplier's test results," and the Company "ha[d] no documented justification for not performing all tests"); ¶86b (2014 observation that "[e]xamination and testing of samples is not done to assure that in-process materials conform to specifications"); and ¶90b (2014 observation that "[t]he accuracy sensitivity, specificity, and reproducibility of test methods have not been established and documented").

Similarly, beginning in 2009, the FDA observed deficiencies in Impax's "production record review" that persisted from year to year without correction. *See* ¶46b (2009 observation that "'[c]leaning validation for non-dedicated equipment is deficient' due to a lack of documentation of certain cleaning practices"); ¶47b (2010 observation that "'[w]ritten procedures are not established for the cleaning and maintenance of equipment'"); ¶47d (2010 observation that "'[w]ritten procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment, and materials used'"); ¶49d (2011 observation that "'[w]ritten production and process control procedures are not followed in the execution of production and process control functions and documented at the time of performance.'"); ¶66d (2012 observation that "'[w]ritten production and process control procedures are not followed in the execution of production and process control functions.'"); ¶70e (2013 observation that "'[w]ritten procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment and materials used, description in sufficient detail of the methods of disassembling and reassembling equipment as necessary to assure proper cleaning and maintenance, and parameters relevant to the operation.'"); ¶90c (2014 observation that "'[w]ritten procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment and materials used and instructions for protection of clean equipment from contamination prior to use.'").

Impax's deficiencies concerning its "process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications" followed the same pattern – observed in 2009, repeated year after year, and never corrected. *See* ¶46a (2009 observation that "the Company had failed to adequately investigate 'possible root cause[s] related to [the] integrity

of' the coating of capsules"); ¶47f (2010 observation that "'[t]here is a failure to thoroughly review any unexplained discrepancy whether or not the batch has already been distributed,' including that 'the investigation into the identification of an increased trend in metal contamination and the proposed corrective action does not ensure that the equipment used in manufacturing is properly maintained in order to prevent the adulteration of drug product.'"); ¶49a (2011 observation that "'[t]here is a failure to thoroughly review any unexplained discrepancy whether or not the batch has already been distributed.'");  ¶66e (2012 observation that "'[s]pecifically, [t]here is a failure to document and investigate unexplained discrepancies that arise during the course of manufacturing and [quality control] analytical testing,'"); ¶70c (2013 observation that "'[t]here is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed.'"); ¶86f (2014 observation that "'[t]here is a failure to conduct a thorough review of the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed,' and Impax "'failed to initiate timely corrective and preventive actions for this [d]eviation'"); and ¶90a (2014 observation that "'[t]here is a failure to thoroughly review any unexplained discrepancy whether or not the batch has already been distributed'").

Despite their actual knowledge of the deficiencies, the Director Defendants did nothing to correct the deficiencies and instead knowingly allowed them to persist for years.  Impax received seven Form 483s and a Warning Letter concerning multiple repeat issues, which directly lead to the FDA withholding approval of an important drug, Rytary, and GSK terminating a key contract with Impax.  ¶¶77-82.  Accordingly, like in *Allergan*, this action is not a situation where a board simply received a few complaints about a non-essential product.  Rather, the Company lost its key commercial partner GSK, lost commercial opportunities, lost sales, and exposed itself to significant risk of FDA actions with increasing severity.  Under these circumstances, there is a reasonable doubt that the Director Defendants acted in good faith, and they are substantially likely to be held liable for their inaction.  Demand is therefore excused.  *See Allergan*, 765 F.3d at 1150.

In particular, the "significant magnitude and duration" of the cGMP violations supports a finding that demand on the Board was futile.  *See Allergan*, 765 F.3d at 1154; *Pfizer*, 722 F. Supp.

2d at 460 (holding that demand is futile, "especially when the alleged wrongdoing is of substantial 'magnitude and duration.'"); (citing *Abbott Labs*, 325 F.3d at 806 (quoting *McCall v. Scott*, 239 F.3d 808, 823 (6th Cir. 2001)). In *Allergan*, the Ninth Circuit concluded:

> [T]he illegal conduct was unquestionably of significant magnitude and duration. It persisted for over a decade, involved several divisions at Allergan, and constituted nearly a dozen separate programs, all related to one of Allergan's most important and widely known therapeutic drugs. The combination of widespread and enduring illegality in Allergan's corporate activity strongly supports an inference of Board knowledge and intentional disregard. *See SAIC*, 948 F. Supp. 2d at 387; *Pfizer*, 722 F. Supp. 2d at 460; *Veeco*, 434 F. Supp. 2d at 278; *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y.2000).

*Allergan*, 765 F.3d at 1154. Similarly, in *Abbott Labs*, the Seventh Circuit reversed the district court's dismissal, holding that it was reasonable to infer that "the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith." *Id*. at 809 (emphasis added); *see also In re SFBC Int'l, Inc. Sec. & Derivative Litig*., 495 F. Supp. 2d 477, 486 (D.N.J. 2007).

Here, the Complaint includes detailed facts showing that Impax was under intense FDA scrutiny and received seven Form 483s and a Warning Letter concerning multiple repeat regulatory cGMP violations over a span of five years. ¶¶46, 47, 49-54, 65, 66, 69, 70, 84-86, 89, 90. Despite these repeat warnings and their specific knowledge of the repeat regulatory violations, the ***Board took no action***. Indeed, the repeat violations reveal that the Director Defendants: (i) took no steps to ensure safe manufacturing procedures to achieve regulatory compliance when safety issues came to their attention; and (ii) never adopted, let alone oversaw, an adequate system for ensuring adequate public disclosures concerning FDA compliance issues. The particularized facts alleged in the Complaint are at least as damning as those in *Allergan* and *Abbott Labs*, if not more so, and demonstrate that the Director Defendants are substantially likely to be held liable for their knowing and deliberate failure to correct persistent cGMP violations, which was unlawful and could not have been in good faith. Accordingly, demand is excused. *See Allergan*, 765 F.3d at 1150 (directors' consciously failing to act in the face of a known duty to act, especially in light of the severe public health risks associated with failing to act, renders demand futile).

# V.     THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY

## A.     Legal Standards For Breach Of Fiduciary Duty Claim

Plaintiffs need only allege, "enough facts to state a claim to relief that is plausible on its face" to defeat a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). This is not "a probability requirement," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. Importantly, when applying this plausibility standard, "a court must accept as true all [factual] allegations contained in a complaint," *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009), and "draw all reasonable inferences" in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 58 (2d Cir. 1999).

In order to adequately allege a claim for breach of fiduciary duty under Delaware law, a plaintiff must plead that: (i) a fiduciary duty exists; and (ii) a fiduciary breached that duty. *See Heller v. Kiernan*, No. Civ.A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), aff'd, 806 A.2d 164 (Del. 2002). Here, Plaintiffs have stated plausible claims against Defendants under Delaware law for claims for breach of fiduciary duty for: (i) willfully failing to comply with regulatory obligations, including by failing to take adequate, necessary corrective action in response to seven Form 483s and a Warning Letter (¶139); and (ii) knowingly disseminating to the public materially false and misleading statements (¶140) concerning these issues.

## B.     The Complaint States A Breach Of Fiduciary Duty Claim

The Delaware Supreme Court has repeatedly stated that Delaware officers and directors owe the duties of care, good faith, and loyalty to their corporations and the stockholders they serve. *See, e.g., Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995). The duty of loyalty "is violated '[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities [and] failing to discharge [the non-exculpable fiduciary duty of loyalty] in good faith.'" *Allergan*, 765

F.3d at 1150 quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added). As discussed in detail herein, Plaintiffs plead with particularity that both the Director Defendants (¶¶19-27, 31) and Officer Defendants (¶¶28-30, 32) deliberately and persistently disregarded their responsibility to correct known cGMP deficiencies (¶¶34-108) and thereby breached their fiduciary duty of loyalty and good faith. (¶¶109-116, 137-142).

Defendants rely on *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996) and misinterpret Plaintiffs' allegations regarding their failure to properly manage the Company. Defs.' Brf. at 17, 22. *Caremark* is inapplicable because in that case the plaintiffs alleged that the directors negligently failed to implement systems that would allow them to monitor the operations of the corporation and thus failed to become aware of arguably unlawful acts committed by relatively far-flung, low-level employees. *See Caremark*, 698 A.2d at 967. The *Caremark* Court's review of directors' liability was "predicated upon ignorance of liability creating activities[,]" as there were no facts to indicate the directors "'conscientiously permitted a known violation of law by the corporation to occur.'" *Id.*at 971-72.[6]

Here, by contrast, Plaintiffs allege that the Individual Defendants had actual knowledge of numerous regulatory violations dating back to 2009 and deliberately declined to correct the problems despite the FDA's repeated observations and warnings. Defendants thus demonstrated a conscious disregard for their responsibilities and failure to discharge their fiduciary duty of loyalty and good faith, which is more than sufficient to state a claim upon which relief may be granted. *See Allergan*, 765 F.3d at 1150; *Abbott*, 325 F.3d at 802-03.

### C.   The Complaint States A Claim For False Statements

When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communications given ***with complete candor and in good faith***. *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990

---

[6] Citing (fn. 12 on pg 22) *In re American Apparel, Inc. Derivative Litigation*, 2012 WL 9506072 (N.D. Cal. July 31, 2012), Defendants argue that gross negligence does not support bad faith. But the Court went on to note the different standard where the directors "were blamelessly unaware of the misconduct leading to the corporate liability" compared to where the complaint pleads knowledge by the directors. *Id.* at 33. Here, the complaint alleges such knowledge.

(Del. Ch. 2007); *see also Malone*, 722 A.2d at 10 (whenever directors and officers "communicate publicly or directly with shareholders about the corporation's affairs, [they] have a fiduciary duty to shareholders to exercise due care, good faith and loyalty"). To that end, "[c]ommunications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim." *infoUSA*, 953 A.2d at 990; *see also Malone*, 722 A.2d at 14 (when directors and officers are "deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty.").

A fiduciary may be held liable either for making a "material misdisclosure" or if he authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith (in other words, 'dishonestly') fails to correct the misleading impression created by the earlier communication. *See Metro Commc'n. Corp. BVI v. Advanced MobileComm Techs. Inc.*, 854 A.2d 121, 159 (Del. Ch. 2004). Here, in alleging that the Individual Defendants caused or permitted Impax to issue false and misleading statements, Plaintiffs detail the specific misstatements issued by Impax, identify the reasons why those statements were false and misleading, and detail how the Individual Defendants were on notice that the alleged statements were false and misleading when issued. ¶¶48, 57, 62-64, 67, 96-99, 134, 137-142. Accordingly, Plaintiffs have stated a breach of fiduciary claim for the Individual Defendants' issuance of false and misleading statements.[7]

---

[7] Defendants argue that Plaintiffs have impermissibly relied on allegations in the Class Action complaint to support their claim against Defendant Hsu. Defs.' Brf. at 24. Defendants' argument is baseless. *First*, Plaintiffs have sufficiently alleged that Defendant Hsu is liable for disseminating false and misleading statements separate and apart from the statements advanced in the Class Action. ¶¶96-99. *Second*, the cases on which Defendants rely in support of their argument are inapposite because in those cases the plaintiff relied on allegations in another complaint as the only basis for certain of its allegations. *See, e.g., In re Connectics Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008). Here, Plaintiffs are merely showing that the Court in the Class Action found there the plaintiffs properly alleged securities fraud based on much of the same misconduct.

---

### D.    **Impax's Exculpatory Provision Does Not Protect Defendants**

Contrary to Defendants' assertions, Plaintiffs' claims cannot be dismissed at the pleading stage based on the "exculpatory provision" of Impax's charter because such an argument is considered an affirmative defense, which is not suitable at the pleading stage.  *See Sanders v. Wang,* No. 16640, 1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999) (use of exculpatory provisions to shield directors from personal liabilities presents an affirmative defense not amenable for pretrial disposition); *see also In re Tower Air*, *Inc.*, 416 F.3d 229, 242 (3rd Cir.) (same); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 516 (D. Del. 2008) (same).  Moreover, even assuming, *arguendo,* that Defendants properly raised this defense at the pleading stage (which they have not), the liability bar of section 102(b)(7) of the Delaware General Corporation Law does not extend to "acts or omissions not in good faith" or which "involve intentional misconduct or a knowing violation of law."  *See Abbott Labs*., 325 F.3d at 810 ("breaches other than duty of care may not exempt the directors from liability and would disable the directors from considering a demand fairly").  Indeed, section 102(b)(7) does not shield defendants from liability where, as here, there are allegations of multiple violations of regulations and other serious internal control deficiencies.  *See, e.g., Lyondell Chemical,* 2008 WL 4174038, at *3 ("a conscious disregard of one's responsibilities" is "properly treated as a non-exculpable, non-idemnifiable violation of the fiduciary duty to act in good faith'").  Consequently, Plaintiffs have adequately alleged that the Defendants' breaches are not violations of the duty of care alone but that their conduct was not in "good faith" under section 102(b)(7)(ii).[8]

## VI.    **CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Motion be denied.[9]

---

[8] Courts routinely deny motions to dismiss where, as here, the plaintiff has pled a non-exculpated breach of fiduciary duty by the officers and directors.  *See e.g., In re Galena Biopharma, Inc. Derivative Litig.*, No. 14-cv-382, 2015 WL 455385, at *8 (D. Or. Feb. 4, 2015) (holding that the exculpatory clause in the company's charter did not warrant dismissal of plaintiffs' complaint because plaintiffs sufficiently alleged non-exculpated conduct); *Abbott Labs*, 325 F.3d at 811 (same); *Cendant*, 189 F.R.D. at 132-33 (same).

[9] If this Court is inclined to grant any part of the Motion, Plaintiffs respectfully requests leave to amend the Complaint.

1   DATED: May 15, 2015                    BERNSTEIN LITOWITZ BERGER
2                                              & GROSSMANN LLP

3                                          /s/ Brett M. Middleton

4
5                                          Brett M. Middleton (Bar No. 199427)
                                           12481 High Bluff Drive, Suite 300
6                                          San Diego, California 92130
                                           Tel:    (858) 793-0070
7                                          Fax:    (858) 793-0323
                                           brettm@blbglaw.com
8                                              -and-
                                           Mark Lebovitch
9                                          David L. Wales
                                           Adam D. Hollander
10                                         1285 Avenue of the Americas, 38th Floor
                                           New York, New York 10019
11                                         Tel:    (212) 554-1400
                                           Fax:    (212) 554-1444
12                                         markl@blbglaw.com
                                           davidw@blbglaw.com
13                                         adam.hollander@blbglaw.com

14
                                           Frank R. Schirripa
15                                         HACH ROSE SCHIRRIPA & CHEVERIE LLP
                                           185 Madison Avenue
16                                         New York, New York 10016
                                           Tel:    (212) 213-8311
17                                         Fax:    (212) 779-0028
                                           fschirripa@hrsclaw.com
18
19
                                           *Attorneys for Plaintiff International Union of
20                                         Operating Engineers Local 478*

21
                                           KESSLER TOPAZ MELTZER & CHECK, LLP
22                                         Eric L. Zagar (Bar No. 250519)
                                           Matthew A. Goldstein
23                                         280 King of Prussia Road
                                           Radnor, PA 19087
24                                         Tel:    (610) 667-7706
                                           Fax:    (610) 667-7056
25
26                                         *Attorneys for Plaintiff Randall K. Wickey*

27
28